UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NICOLE M. CARRIER-TITTI,

            Plaintiff,

     v.                               **DECISION AND ORDER**
                                          **06-CV-0647 (VEB)**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

## I. Introduction

    Plaintiff Nicole M. Carrier-Titti challenges an Administrative Law Judge's ("ALJ") determination that she is not entitled to disability insurance benefits ("DIB") under the Social Security Act ("the Act").  Plaintiff alleges she has been disabled since December 2, 2001, because of chronic pain and limitations from a spinal cord injury that resulted in incomplete quadripeligia, traumatic vision syndrome, muscle spasticity and weakness, loss of mobility, and fatigue and memory problems.  Plaintiff met the disability insured status requirements of the Act through September 4, 2004.

## II.  Background

    Plaintiff filed an application for DIB on January 8, 2003.  Her application was denied initially and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).   Pursuant to Plaintiff's request, an administrative hearing was held via teleconference on October 8, 2004, before ALJ Guy Arthur, at which time Plaintiff and her attorney

appeared.  A vocational expert also testified.  The ALJ considered the case *de novo*, and on January 21, 2005, issued a decision finding that Plaintiff was not disabled.  The Appeals Council denied Plaintiff's request for review on April 13, 2006.

On May 25, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on September 12, 2006, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called Plaintiff's Brief) on October 26, 2006.  On January 10, 2007, Defendant filed the Commissioner's Brief In Support Of Her Motion For Judgment On The Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

For the reasons set forth below, the Court finds that the Commissioner's decision is not supported by substantial evidence and contrary to the applicable legal standards.  The Court remands this matter to the Commissioner of Social Security for further administrative action consistent with the findings contained within this decision.

---

[1] The ALJ's January 21, 2005, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

## III.  Discussion

### A.  Legal Standard and Scope of Review:

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error.  See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from

the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y.

1992).  In other words, this Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own

judgment for that of the [Commissioner], even if it might justifiably have

reached a different result upon a *de novo* review."  Valente v. Sec'y of Health

and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation

process to determine whether an individual is disabled as defined under the

Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States

Supreme Court recognized the validity of this analysis in Bowen v. Yuckert,

482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it

remains the proper approach for analyzing whether a claimant is disabled.

This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently
engaged substantial gainful activity.  If he is not, the [Commissioner]
next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to do basic work active-
ties.  If the claimant has such an impairment, the third inquiry is whether,
based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If the claimant has
such an impairment, the [Commissioner] will consider him disabled with-
out considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is
afflicted with a "listed" impairment is unable to perform substantial gain-
ful activity.  Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's severe impairment,
he has the residual functional capacity to perform his past work.  Finally,
if the claimant is unable to perform his past work, the [Commissioner]
then determines whether there is other work which the claimant could
perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

## B.  Analysis

### 1.       Commissioner's Decision

In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through September 4, 2004 (R. at 35);[3]  (2) Plaintiff has not engaged in substantial gainful activity since the alleged onset date of disability (R. at 35); (3) Plaintiff's residuals from status post automobile accident including traumatic vision syndrome status post head injury, status post spinal cord injury, status post spinal cord surgery and post traumatic

---

[3] Citations to the underlying administrative are designated as "R."

stress disorder (PTSD) are considered "severe" based on the requirements in the Regulations at 20 C.F.R. § 404.1520(c) (R. at 35); (4) Plaintiff's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 for the reasons set forth in the body of the decision (R. at 35); (5) Plaintiff's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision (R. at 35); (6) Plaintiff retains the following residual functional capacity:  Plaintiff can perform a wide range of light and alternatively sedentary activities on a sustained basis, 8 hours per day/5 days a week (20 C.F.R. 404.1527(f).  Plaintiff experiences certain limitations including never being able to climb ladders, ropes and scaffolds; avoiding hazardous heights and moving machinery; and no exposure to extreme temperature changes. Claimant requires low stress, routine work activities (defined as requiring no more than moderate attention, concentration, persistence or pace for prolonged periods).  Plaintiff is able to occasionally climb stairs and ramps, balance, stoop, kneel and crouch, but never crawl while experiencing moderate pain.  Plaintiff should avoid concentrated exposure to dusts, fumes, chemicals, poor ventilation, excessive humidity, or excessive vibration. Plaintiff is unable to use her upper extremity above the right shoulder for lifting or carrying or for reaching and handling.  Plaintiff has moderate limitations in performing activities within a schedule and maintaining regular attendance for reliability purposes and to being punctual within customary tolerances.  Plaintiff has moderate limitations as to completing a normal work

day or workweek without an unreasonable length and number of rest periods.
Plaintiff should have no immediate contact with the general public but is not
precluded from all contact with the general public (R. at 35); (7) Plaintiff is
unable to perform any of her past relevant work (20 C.F.R. § 404.1565) (R. at
36); (8) Plaintiff is a "younger individual between the ages of 18 and 44" (20
C.F.R. § 404.1563); (9) Plaintiff has "more than a high school (or high school
equivalent) education" (20 C.F.R. § 404.1564); (10) Plaintiff has no
transferable skills from any past relevant work and/or transferability of skills is
not an issue in this case (20 C.F.R. § 404.1568); (11) Plaintiff has the residual
functional capacity to perform a significant range of light and alternatively
sedentary work (20 C.F.R. § 404.1567); (12) Although the Plaintiff's exertional
limitations do not allow her to perform the full range of light work, using the
Medical-Vocational Rule 202.18 as a framework for decision-making, there
are a significant number of jobs in the national economy that she could
perform.  Examples of such jobs include unskilled light jobs such as general
office helper, of which there are 150,000 nationally and 1,200 regionally;
information clerk, of which there are 150,000 nationally and 1,000 regionally;
and cashier, of which there are 220,000 nationally and 2,100 regionally; and
unskilled sedentary jobs such as general office helper, of which there are
250,000 nationally and 2,500 regionally; surveillance systems monitor, of
which there are 160,000 nationally and 900 regionally; and order taker, of
which there are 120,000 nationally and 900 regionally.  The work and
numbers is consistent with the Directory of Occupational Titles (R. at 36); and

(13) Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. § 404.1520(g)) (R. at 36).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 36).

## 2.    Plaintiff's Claims

Plaintiff challenges the decision of the ALJ on the basis that it is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges (a) the ALJ failed to give proper weight to the opinions of Plaintiff's treating physicians, (b) the ALJ's credibility analysis is not supported by the evidence contained within Plaintiff's record, and (c) the proper relief in this matter is reversal of the Commissioner's final decision and remand solely for the calculation of benefits.

### a.    The ALJ Failed to Give Proper Consideration and Weight to the Opinions of Plaintiff's Treating Physicians

Plaintiff's first challenge to the ALJ's decision is that it is not supported by substantial evidence, and is contrary to law, because the ALJ failed to give proper consideration and weight to the opinions of Plaintiff's treating physicians.  See Plaintiff's Brief, pp. 7-17.  Specifically, Plaintiff argues the ALJ failed to apply the correct legal standard when he did not afford controlling weight to Plaintiff's treating physicians, and improperly substituted his lay opinion for competent opinions.  Id.  The Defendant argues the ALJ properly evaluated the opinions of Plaintiff's treating physicians, but decided not to give the opinions controlling weight.  See Defendant's Brief, pp. 5-8.

According to the "treating physician's rule,"[4] the ALJ must give controlling weight to the treating physician's opinion when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

On March 11, 1997, Plaintiff was severely injured in a motor vehicle accident when the driver of a tractor trailer lost control and his vehicle rolled over onto Plaintiff's car (R. at 105-115). Plaintiff was pinned inside her car with her head cocked to the right and her chin to her chest (R. at 105, 111). While Plaintiff was alert and conscious at the accident scene, she complained of tingling and numbness below the neck (R. at 105). Plaintiff was transported to Robert Packer Hospital in Sayre, Pennsylvania for an initial evaluation, and then transferred via helicopter to the spinal cord center at Strong Memorial Hospital at the University of Rochester, Rochester, New York (R. at 105-115). While at Strong Memorial Hospital, Plaintiff was diagnosed with a flexion distraction injury of the cervical spine with incomplete quadriplegia[5] (R. at 111-115, 242-244).

---

[4] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).
[5] A flexion distraction injury is a fracture of one or more vertebrae of the spinal, usually caused by a high energy trauma such as a car crash, a sports accident, or other violent act. When the spinal cord is involved with the injury, numbness, tingling, weakness, or bowel/bladder

Plaintiff underwent surgery for an anterior cervical diskectomy at C5-6, with decompression of the spinal cord, and anterior cervical fusion of C5-6 with a bone graft (R. at 242-244). Plaintiff remained at Strong Memorial Hospital for approximately one month while she underwent acute inpatient rehabilitation (R. at 232-233, 242-244, 268).

After Plaintiff's release from the hospital, her medical record documents repeated complaints of, and treatment for, visual problems, pain in her back, shoulders, and hips, tetraparesis[6] with weakness of the triceps muscles and muscles of the hands, fatigue, sensory loss and loss of fine motor dexterity in both hands, drop foot, knee and leg pain, and psychological symptoms (R. at 116-131, 133-134, 157-158,159, 160-162, 163-170, 171-175, 178-182, 183-184, 209-214, 215-219, 224-225, 227-228, 230, 231, 232-233, 234-236, 237-241, 245-255, 280-282, 283, 288-298). While much of Plaintiff's treatment for her symptoms has been conservative, including chiropractic adjustments, counseling, physical therapy, and massage therapy, she has also taken prescription medications to alleviate her pain and symptoms (R. at 116-131, 133-134, 157-158, 159, 160-162, 163-170, 183-184, 209-214, 215-219, 224-225, 227-228, 232-233, 234-236, 237-241, 245-255, 280-282, 288-298).

Since her release from acute impatient rehabilitation at Strong Memorial Hospital, Plaintiff has been examined periodically by her treating neurosurgeon, Dr. M. Gordon Whitbeck, and her rehabilitation specialist, Dr. Stephan Levinson

---

dysfunction may occur. See
http://www.orthoinfo.aaos.org/topic.cfm?topic=A00368&return_link=0.
[6] Tetraparesis is muscle weakness affecting all four limbs. Also called quadriparesis. See
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=tetraparesis.

(R. at 225-225, 227-228, 232-233, 234-236, 280-283).  She has also been
treated on a regular basis by her primary care physician, Dr. Alan T. Midura, for
short-term ailments, as well as residual pain and other symptoms related to her
accident (R. at 171-177, 245-255).

On June 23, 1999, approximately two years after her accident, Dr.
Whitbeck examined Plaintiff (R. at 235-236).  Plaintiff complained of pain and
stiffness in her neck, intermittent paresthesias in the fingers of both hands,
weakness in her upper left extremity, poor balance, and pain in her left thigh with
flexion of her neck (R. at 235).  While her physical examination revealed only
modest findings, Dr Whitbeck opined Plaintiff had "plateaued neurologically and
that there is probably little else that can be done for her at this point except to
recommend to her that she exercise regularly."  Id.  He noted that, "At this point
in time, she is considered to have a permanent marked partial disability and to be
capable of mainly sedentary activities" (R. at 236).

On August 13, 1999, Dr. Whitbeck reviewed with Plaintiff the results of her
cervical spine MRI (R. at 234).  The doctor noted Plaintiff's symptoms were
unchanged.  Id.  While the MRI did not reveal any evidence of neural
compression, it showed atrophy of Plaintiff's spinal cord at C5-6 and gliosis[7].  Id.
Dr. Whitbeck opined that Plaintiff's "current neurologic status probably represents
the neurologic status that she is likely to have in years to come."  Id.

---

[7] Excessive development of glia, the supporting tissue that is intermingled with the essential
elements of nervous tissue especially in the brain, spinal cord, and ganglia, is of ectodermal
origin, and is composed of a network of fine fibrils and of flattened stellate cells with numerous
radiating fibrillar processes.  See http://www2.merriam-webster.com/cgi-
bin/mwmednlm?book=Medical&va.glia.

Plaintiff's rehabilitation specialist, Dr. Levinson, prepared a letter concerning her medical status on February 3, 2000 (R. at 232-233).  The doctor opined that as a direct result of Plaintiff's spinal cord injury, she suffered tetraparesis with weakness in various muscle groups that became exaggerated with fatigue, sensory loss in both hands with loss of fine motor dexterity in her left hand, sensory loss in both legs that impeded her balance, autonomic dysfunction that resulted in an inability to tolerate hot and cold, and myofascial pain syndrome[8] stemming from on-going weakness in the muscles of her neck and shoulders.  Id.  Dr. Levinson stated that because Plaintiff's injury occurred nearly three years earlier, it was unlikely any further degree of recovery could be expected (R. at 233).

On September 15, 2004, Dr. Levinson sent a letter to Dr. Midura, Plaintiff's primary care physician, noting he had last examined Plaintiff on May 29, 2003 (R. at 224-225, 227-228).  Dr. Levinson stated he had failed to dictate a full report of Plaintiff's last visit, but advised Dr. Midura that Plaintiff's muscle strength and endurance remained limited (R. at 224, 227).  He also noted she was plagued by chronic pain, "not an uncommon occurrence in people with incomplete spinal cord injuries."  Id.  Dr. Levinson opined that Plaintiff remained "completely disabled in terms of physical labor, and her endurance limits what she can tolerate in terms of work in general."  Id.  The doctor suggested Plaintiff's condition was similar to his patients with post-polio syndrome.  Id.  Dr. Levinson

---

[8] Myofascial pain syndrome is condition characterized by chronic pain in the muscle tissues, similar to fibromyalgia. MPS is sometimes the aftermath of injury. Pain medication, anti-inflammatory medication, and therapies aimed at relaxing the muscles tissues (such as massage, chiropractic, and some forms of acupuncture) have been reported as beneficial.  See http://www.medterms.com/script/main/art.asp?articlekey=11694.

advised Dr. Midura that he would be out of the country at the time of Plaintiff's disability hearing, but other physicians in his practice could provide additional information if it was needed.  Id.

On November 1, 2004, Dr. Midura prepared a Medical Assessment of Ability To Do Work-Related Activities (Physical), presumably based on his own treatment relationship with Plaintiff, as well as the information sent to him by Dr. Levinson (R. at 263-266).  Dr. Midura assessed Plaintiff as being unable to complete the physical requirements of even sedentary work[9] (R. at 263-265).  He noted Plaintiff "has very limited stamina and would not be able to complete enough work on a daily or weekly basis to make her employable at this time" (R. at 266).

In his decision, the ALJ declined to grant the opinions of Drs. Whitbeck, Levinson, or Midura controlling weight, or even significant weight (R. at 26-32). With respect to Dr. Whitbeck's notes and opinion, the ALJ noted the doctor's findings reflected "generally stable and moderate neurological findings of atrophy but no evidence of neural compression" (R. at 26, 234-236).  The ALJ failed to discuss Dr. Whitbeck's finding of gliosis, Dr. Whitbeck's advice to Plaintiff that her "current neurological status probably represents the neurologic status she is likely to have in years to come," and Dr. Whitbeck's opinion that, given Plaintiff's "residual deficits in the distal portion of her upper extremities, it is my opinion that

---

[9] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  See 20 C.F.R. 404.1567(a).

she has a permanent marked partial disability and is capable of sedentary activities only." Id.

The Court recognizes that a determination of disability is reserved to the Commissioner of Social Security. See 20 C.F.R. § 404.1527(e)(1); SSR 96-8p. Further, the Social Security Disability program does not provide benefits to those who have a "partial" disability; disability under the Act is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…". See 42 U.S.C. § 423(d)(1)(A). However, the ALJ's discussion of Dr. Whitbeck's medical evidence was selective; he presented some of the doctor's findings, but not all, and omitted the doctor's opinions that Plaintiff had reached her maximum medical improvement, would probably have no improvement in neurological status, and was capable of sedentary activities only (R. at 26, 234). This was error, as the ALJ presented only that part of Dr. Whitbeck's opinion that was negative to Plaintiff's claim for disability. Thus, it appears to the Court the ALJ did not consider the record as a whole. See Clinton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). ("In addition to discussing the evidence supporting his decision in a social security disability benefits case, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.")

With respect to Dr. Levinson, the ALJ stated in his decision, "I reject Dr. Levinson's opinion that claimant is disabled as it is supported by no objective or

recent evidence of record" (R. at 31).  Again, the ALJ was selective with the

evidence he chose to discuss and credit.  As an example, he failed to discuss Dr.

Levinson's assessment of Plaintiff dated February 3, 2000, wherein the doctor

stated he examined Plaintiff on a yearly basis, described Plaintiff's injuries,

symptoms, and limitations, and opined that, "As her injury is now nearly 3 years

old, it is extremely unlikely that any further degree of recovery can be expected"

(R. at 232-233).  Instead, the ALJ discredited Dr. Levinson's opinion on the basis

that he "last saw claimant in May 2003" and that Dr. Levinson offered no medical

evidence to support "his finding" that Plaintiff is "completely disabled" (R. at 27,

31).  The ALJ did not discuss in his decision the similarities in the opinions of

Plaintiff's treating physicians, Drs. Whitbeck and Levinson, especially with

respect to their conclusions that Plaintiff had reached her maximum medical

improvement sometime between 1999 and early 2000 (R. at 232-233, 234-236).

As with the ALJ's treatment of Dr. Whitbeck's opinion, his discussion of Dr.

Levinson's opinion contains error.  The ALJ entirely neglected portions of Dr.

Levinson's reports that, if included in the ALJ's decision, might lead a reasonable

mind to a different conclusion.  While an ALJ is not required to discuss every

piece of evidence, an ALJ should discuss evidence that, if believed, could lead to

a finding of disability.  See Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir.

2003).  ("… the ALJ ignored significant evidence supporting [the Plaintiff's] claim.

The ALJ must evaluate the record fairly. Thus, although the ALJ need not

discuss every piece of evidence in the record, Dixon v. Massanari, 270 F.3d

1171, 1176 (7th Cir. 2001),  the ALJ may not ignore an entire line of evidence that

is contrary to the ruling, Zurawski, 245 F.3d at 888.")  See also Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996).

With respect to Dr. Midura's opinion, the ALJ noted the doctor had provided a post-hearing, "11th hour unsupported assessment" of Plaintiff's ability to do work-related activities (R. at 32, 263-266).  The ALJ gave this assessment little weight on the basis that it was "unsupported" by medical testing, progress notes, or other medical evidence, and that it "was internally inconsistent" with Plaintiff's assertions concerning her own activities and limitations (R. at 32).  The ALJ is correct in noting that there are some inconsistencies in Dr. Midura's evaluation.  Id.  As an example, Dr. Midura assessed Plaintiff as having no limitations from her impairments with respect to seeing, hearing, or speaking. However, it is clear from the medical evidence that Plaintiff has some visual limitations, including reduced peripheral vision, reduced depth perception, blind spots, and chronic visual fatigue associated with convergence weakness (R. at 178-182, 230, 231).  Plaintiff was treated by an optometrist, Dr. Larry B. Wallace, for her vision problems, rather than by Dr. Midura, so it is possible that Dr. Midura was unaware of the degree of Plaintiff's visual limitations.  The Court acknowledges some inconsistencies in Dr. Midura's assessment of Plaintiff's ability to engage in work-related activities, but also notes that, contrary to the ALJ's assertion in his decision that Dr. Midura failed to provide appropriate medical evidence to back up his assessment, the record contains 18 pages of Dr. Midura's treatment notes, documenting 15 office visits over a span of more than two years (R. at 171-177, 245-255).  The notes reveal Plaintiff reported to Dr.

Midura chronic neck and back pain that prevented "her from doing certain activities for any length of time," sacroiliac problems, left arm paresthesias, occasional left foot drop, loss of sensation in both hands to hot and cold, upper extremity weakness, headaches, depression and fatigue.  Id.  Plaintiff was treated with various prescription medications, including neurontin (gabapentin)[10], Zyrtec[11], albuterol[12], Zoloft[13], Xanax[14], and over-the-counter remedies including Tylenol and ibuprophen.  The ALJ noted in his decision that Plaintiff "takes only non-prescription medication" (R. at 30)  Obviously, the ALJ's failure to properly evaluate Plaintiff's medications is a serious error, as it has an impact on his assessment of her medical treatment, as well as on his assessment of her credibility.  While the Court will not go so far as to say Dr. Midura's opinion should have been given controlling weight in the ALJ's decision, it should have

[10] Gabapentin is used to help control certain types of seizures in patients who have epilepsy. Gabapentin is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). Gabapentin is in a class of medications called anticonvulsants. Gabapentin treats seizures by decreasing abnormal excitement in the brain.  Side effects include drowsiness, tiredness, weakness, dizziness, headache, unsteadiness, anxiety, and memory problems.  See www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

[11] Zyrtec (Cetirizine) is used to temporarily relieve the symptoms of hay fever (allergy to pollen, dust, or other substances in the air) and allergy to other substances (such as dust mites, animal dander, cockroaches, and molds). These symptoms include sneezing; runny nose; itchy, red, watery eyes; and itchy nose or throat. Cetirizine is also used to treat itching and redness caused by hives.  See www.nlm.nih.gov/medlineplus/druginfo/meds/a698026.html.

[12] Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways). Albuterol inhalation aerosol is also used to prevent breathing difficulties during exercise.  See www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html.

[13] Zoloft (Sertraline) is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks), posttraumatic stress disorder (disturbing psychological symptoms that develop after a frightening experience), and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life).  See www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html.

[14] Xanax (Alprazolam) is used to treat anxiety disorders and panic attacks. Alprazolam is in a class of medications called benzodiazepines. It works by decreasing abnormal excitement in the brain.  See www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html.

been, at the very least, considered much more seriously in light of Plaintiff's entire record, including Dr. Midura's own treatment notes, and the notes and opinions of Drs. Whitbeck and Levinson.  See 20 C.F.R. § 404.1523; see also Clinton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996); Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003).

Moreover, "the lack of specific clinical findings in the treating physician's report [does] not, standing by itself, justify the ALJ's failure to credit the physician's opinion."  Clark v, Comm'r of Soc. Sec., 143 F.3d at 118 (citing Schaal, 134 F.3d 496)).  The ALJ has an "affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte,* even if plaintiff is represented by counsel" to determine upon what information the treating source was basing his opinions.  Colegrove v. Comm'r of Soc. Sec., 399 F.Supp.2d 185, 196 (W.D.N.Y. 2005) (citing Clark, 143, F.3d at 118; Schaal, 134 F.3d at 505); See also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").  Failure to re-contact is error.  See Taylor v. Astrue, No. CV-07-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) (finding it error for the ALJ to not re-contact Plaintiff's treating physician when he determined that the physician's opinion was "not well-supported by objective medical evidence").  In this matter, Plaintiff and her attorney provided the medical and other evidence that they believed would satisfy the ALJ's criteria for a finding of disability.  As an example, during the

hearing, Plaintiff's attorney discussed with the ALJ Dr. Levinson's letter of

September 15, 2004, in which Dr. Levinson advised Dr. Midura that he had last

examined Plaintiff on May 29, 2003, and noted "her muscle strength and

endurance remain limited and she is plagued by chronic pain" (R. at 224, 227,

336).  Dr. Levinson also wrote that, "I am currently on sabbatical, and in my

absence I have transferred care of my patients to [other named physicians at

Strong Memorial Hospital]."  Id.  The ALJ's response to Plaintiff's attorney's query

as to whether or not he was familiar with the document was, "Let's see.  All right,

I have that.  I'll certainly go back and take a look at that" (R. at 336).  The ALJ did

not comment further on the sufficiency of the document, or about whether Dr.

Levinson should submit additional records, potentially leaving Plaintiff and her

attorney to reasonably assume the document provided the evidence the ALJ was

seeking about Plaintiff's medical condition (R. at 336-338).  Thus, when the ALJ

went back to take a look at the document and found it insufficient in providing the

medical evidence he sought, he should have, *sua sponte*, further developed the

record by re-contacting Dr. Levinson, or the colleagues to whom the doctor

referred his patients, and/or Dr. Midura.  See Colegrove v. Comm'r of Soc. Sec.,

399 F.Supp.2d 185, 196 (W.D.N.Y. 2005) (citing Clark, 143, F.3d at 118; Schaal,

134 F.3d at 505); See also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1); Taylor v.

Astrue, No. CV-07-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008).

The Court also notes that Dr. Levinson completed another assessment of

Plaintiff's physical limitations on May 17, 2005, approximately four months after

the ALJ made his decision (R. at 280-281).  Dr. Levinson also requested that

Plaintiff undergo an independent functional capacity evaluation, and it was completed on June 22, 2005 (R. at 288-298). Briefly, the functional capacity evaluation revealed that Plaintiff's limitations were fairly consistent with the conclusions drawn by Drs. Levinson and Madura that Plaintiff was capable of less than sedentary work, let alone a limited range of light work. Dr. Levinson affirmed the results of the functional capacity evaluation, under penalty of perjury, on July 15, 2005 (R. at 283).  This information was submitted to the Appeals Council by Plaintiff in her request for review (R. at 17).  Dr. Levinson's opinion, the results of the independent functional capacity evaluation, and the doctor's affirmation became part of the record when the Appeals Council denied Plaintiff's request for review (R. at 5-8); Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996). ("[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.").  On remand, the ALJ must consider this evidence in his decision and grant it appropriate weight.

Therefore, the Court remands this matter to allow the ALJ an opportunity to follow the law in assigning weight to the opinions of Plaintiff's treating physicians, Drs. Whitbeck, Levinson, and Midura.  Also, if the ALJ reaches the same conclusion as to their opinions, i.e., that they are not supported by objective clinical findings, the Court instructs the ALJ to re-contact the two physicians who have treated Plaintiff most recently, Drs. Levinson and Midura, to determine on what their opinions are based.

**b.      The ALJ's Credibility Analysis Is Flawed Because He Failed to Consider the Opinions of Plaintiff's Treating Physicians When He Assessed Her Pain and Limitations**

As the Court has already determined that the treating physicians' opinions were not properly assessed, the ALJ's analyses of Plaintiff's credibility, and his ultimate determination that she retained the residual functional capacity to perform a significant range of light and sedentary work, were necessarily flawed, because (1) they did not incorporate evidence supplied by Plaintiff's treating physicians that corroborate her claim of disabling pain and limitations resulting from her 1997 motor vehicle accident, and (2) the ALJ misstated, and failed to correctly analyze, the types of medications Plaintiff uses on a regular basis to alleviate her symptoms (R. at 29-31).

"[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." Simmons v. U.S. R.R. Retirement Bd., 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "However, the ALJ is 'not obliged to accept without question the credibility of such subjective evidence.'" Martone v. Apfel, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). In analyzing credibility, the ALJ must first determine whether the claimant has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); S.S.R. 96-7p, 1996 WL 374186, at *2. Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. S.S.R.

96-7p, 1996 WL 374186, at *2; 20 C.F.R. § 404.1529(c); <u>Borush</u>, 2008 WL 4186510, at *12. Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," S.S.R. 96-7p, 1996 WL 374186, at *3, an ALJ will consider the factors listed in the regulations.[15] 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

In this case, the ALJ properly followed the two step credibility analysis and considered some of the listed factors in finding Plaintiff's alleged symptoms not fully credible (R. at 29-32). However, the ALJ relied, in part, on the absence of a treating physician's opinion supporting Plaintiff's alleged symptoms and limitations. <u>Id</u>. In light of Drs. Levinson and Midura's opinions, and the additional medical evidence provided by Dr. Levinson, all of which substantially support Plaintiff's allegations, the ALJ will have to reconsider his credibility analysis on remand. <u>See</u> 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

Additionally, the Court notes that the ALJ's analysis relied upon his opinion that Plaintiff's daily activities, including light housekeeping and cooking, grocery shopping, driving, bill paying, watching television, and socializing with friends, belie her claim of disabling pain and other limitations (R. at 30-31). Certainly an ALJ is permitted to consider activities of daily living in his credibility analysis. <u>See</u> 20 C.F.R. § 404.1529(c); SSR 96-7p. If a claimant's activities reflect physical and mental abilities and skills that are transferable to the

---

[15] The listed factors are: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

workplace, it may be appropriate to discredit the claimant's allegations of total disability.  See Burch v. Barnhart. 400 F.3d 676, 681 (9th Cir. 2005) *citing* Fair v. Bowen, 885 F.2d 597,603 (9th Cir. 1989).  However, the Court is mindful that a claimant's activities of daily living may not accurately reflect an ability to work day in and day out, for eight hours per day, five days per week.  Performing simple daily activities, such as dusting, doing small loads of laundry, bathing and grooming one's self, and walking a dog for short distances, does not necessarily prove a claimant can perform regular work activity.  See Walston v. Gardner, 381 F.2d 580, 586 (6th Cir. 1967).  ("The fact that appellant can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this appellant possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by appellant.")  As in the Gardner matter, Plaintiff's activities are intermittent, performed at her own pace, and with as many rest periods as needed (R. at 65, 78-79, 93, 95-101, 311, 313, 315-317, 320-321).  The evidence before the Court does not clearly show Plaintiff has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." See McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc), *abrogated on other grounds,* 524 U.S. 266, 118 S.Ct. 1984, 141 L.Ed.2d 269 (1998).  It seems that few, if any, employers in the world of competitive work could offer Plaintiff a job that would accommodate her physical needs and limitations.  Upon remand, the Court recommends that the ALJ reconsider his

23

finding that Plaintiff retains the residual functional capacity to engage in full time employment in the real world, especially in light of the many exertional and non-exertional limitations that he established for her in his decision (R. at 35).

Finally, the ALJ stated in his decision that Plaintiff's symptoms were treated only by over-the-counter medications from which she reported no side effects (R. at 29-32).  The ALJ is mistaken; at the time of her hearing, Plaintiff was using a number of prescription medications which have the potential to produce significant side effects (R. at 70, 245-255).  The ALJ failed to discuss with Plaintiff her medications at the time of the hearing, and misstated the evidence concerning medications and side effects in his decision (R. at 29-32, 301-339).  Upon remand, the ALJ must consider the medical evidence of all of Plaintiff's impairments, including the evidence provided by her treating physicians, the types, dosages, effectiveness and side effects of her medications, and must reassess Plaintiff's credibility according to the Commissioner's guidelines.  See 20 C.F.R. § 404.1529; SSR 96-7p; 20 C.F.R. §§ 404.1523, 404.1529(a), (directing the ALJ to consider all available evidence).

### c.    Remand to the Commissioner For Further Administrative Proceedings, Rather Than a Calculation of Benefits, is the Appropriate Remedy

Plaintiff argues that reversal of the Commissioner's final decision, and a remand solely for the calculation of benefits, is the appropriate remedy in this case.  The Court disagrees.

After reviewing the decision of the Commissioner, a district court may affirm, modify, or reverse the Commissioner's decision with or without remand to

the Commissioner for a rehearing.  See 42 U.S.C. § 405(g).  A reversal and remand solely for the calculation of benefits is appropriate when the administrative record has been fully developed and the only reasonable conclusion that could be drawn is that the claimant is disabled within the meaning of the Social Security Act.  See Podedworney v. Harris, 745 F.2d 210, 224 (3d Cir. 1984). ("A reversal, as opposed to a remand, is in order only where a fully developed administrative demonstrates that the claimant is clearly entitled to benefits, and thus a new administrative hearing would serve no useful purpose.") See also Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993); Micus v. Bowen, 979 F.2d 602, 609.

        In this matter, the Court cannot say, the record, considered as a whole, supports only the conclusion that Plaintiff is disabled.  Further findings, particularly the ALJ's re-consideration of the pre-decision evidence submitted by Drs. Whitbeck, Levinson and Midura, and post-decision evidence submitted by Dr. Levinson, as well as a thorough review of Plaintiff's medications, would assure a proper disposition of Plaintiff's disability claim.  See Butts v. Barnhart, 388 F.3d 377, 385 (2nd Cir. 2005). ("In deciding whether a remand is the proper, we have stated that where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate.")  See also Rosa V. Callahan, 168 F.3d 72, 83 (2nd Cir. 1999).  ("This case, in our view, is one in which remand for further development of the evidence is the wiser course.")

## Conclusion

After carefully examining the administrative record, the Court finds cause to remand this case to the Commissioner for further administrative proceedings consistent with this decision.  Accordingly:

IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings is GRANTED in part and DENIED in part.

FURTHER, that Defendant's Motion for Judgment on the Pleadings is DENIED.

FURTHER, that this case is REMANDED to the Commissioner of Social Security for further proceedings consistent with this Decision and Order.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated: June 1, 2009
Syracuse, New York

26